**Sanjay Wadhwa**
Senior Associate Director
New York Regional Office
**SECURITIES AND EXCHANGE COMMISSION**
3 World Financial Center, Suite 400
New York, New York  10281
(212) 336-0181
Attorney for the Plaintiff

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| | ) Civil Action No. |
| **IMAGEXPRES CORPORATION, JOHN ZANKOWSKI, and KEVIN ZANKOWSKI ,** | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants ImageXpres Corporation ("ImageXpres" or "Company"), John Zankowski, and Kevin Zankowski (collectively "Defendants"):

### SUMMARY OF ALLEGATIONS

1. This case involves a fraudulent scheme to misrepresent the financial performance of ImageXpres, a publicly traded "microcap" company located near Rochester, New York that has long purported to be engaged in various digital imaging businesses. Over a multi-year period, John Zankowski, ImageXpres's CEO, and Kevin Zankowski, John Zankowski's son and the Company's CFO, made numerous materially false and misleading statements about the

Company's operations and revenue in ImageXpres press releases, financial statements and other documents that they prepared and disseminated to the public.

2. Beginning with the year ended December 31, 2008 and continuing through the second quarter of 2011, ImageXpres reported substantial sales revenue and dramatic revenue growth in numerous press releases and financial statements even though it lacked the financial resources to produce on a commercial scale the products that it touted and failed to secure the customer orders that it claimed to have received. The Company reported revenue growth rates in excess of 300 percent during this period for some products in spite of the absence of virtually any bona fide sales.

3. For example, John Zankowski and Kevin Zankowski claimed in ImageXpres press releases and financial statements that it was generating hundreds of thousands of dollars in sales of digital advertising systems to an affiliated reseller. These claims were false because the reseller was not obligated to pay ImageXpres unless the reseller succeeded in securing firm end-user orders for the systems, which it never did, and because the reseller lacked the ability to pay ImageXpres absent such orders. In fact, ImageXpres never shipped or produced more than a few prototypes of the system and lacked the resources to manufacture the number of units that the Defendants claimed to have sold to the reseller. Despite the Defendants' fraudulent efforts to portray ImageXpres as an increasingly profitable small technology company, ImageXpres is essentially dormant now with little or no capital.

4. By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

5. Unless the Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

6.  The Commission brings this action pursuant to authority conferred by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.  The Commission also seeks a final judgment against John Zankowski and Kevin Zankowski (a) ordering them to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (b) imposing officer-and-director bars under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (c) imposing penny stock bars under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

7.  This Court has jurisdiction over this action, pursuant to 28 U.S.C. §1331 and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.  Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Many of the events constituting or giving rise to the alleged violations occurred in the Western District of New York, where ImageXpres maintained its principal office during the relevant period.  In addition, both John Zankowski and Kevin Zankowski resided in this district during the relevant period and currently reside in this district.

9.  In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails.

## DEFENDANTS

10.  **ImageXpres** is a Colorado corporation formed in 2003 with its principal place of

business in Fairport Village, New York.  Its common stock is quoted on OTC Link, which is owned and operated by OTC Markets Group (formerly known as Pink OTC Markets Inc.).  OTC Link is an electronic inter-dealer quotation system that displays quotes from broker-dealers for over-the-counter securities.  Even though ImageXpres is not and was not an Exchange Act reporting company, price quotes for ImageXpres stock have also appeared on the OTC Bulletin Board ("OTCBB") website under the ticker symbol "IMJX."  ImageXpres currently has approximately 1.01B shares of common stock outstanding, but it is not actively traded at this time.  On August 29, 2012, the Depository Trust Corporation ("DTC") suspended all services other than custody services for ImageXpres in connection with the filing of *SEC v. Bronson*, No. 12-CV-6421 (S.D.N.Y. filed Aug. 23, 2012), an unrelated matter involving the alleged illegal resale of certain penny stocks, including ImageXpres.  Neither ImageXpres nor the Zankowskis were named as defendants in that case.  During 2012, ImageXpres's stock price hovered around $0.0001 per share on minimal trading volume, and there has been no price data reported since December 2012.

11.     **John Zankowski**, age 68, resides in Fairport, New York.  He has been President and Chief Executive Officer of ImageXpres, and a member of its Board of Directors, since its inception.  John Zankowski owned more than 5 percent of the Company's outstanding shares during the relevant period.  John Zankowski was also one of the founders and directors of SmartKiosk Holdings, Inc. ("SKH"), a product reseller affiliated with ImageXpres that was formed in 2008 and had its principal place of business in Tucker, Georgia.

12.     **Kevin Zankowski**, age 42, resides in Fairport, New York.  During the relevant period, he was the CFO and a director of ImageXpres and owned more than 5 percent of the Company's outstanding shares.  During that time, he also worked for SKH.

## THE DEFENDANTS' FRAUD

**Background**

13. According to its website, ImageXpres is purportedly "a digital printing and imaging solutions, software development, and custom designed specialty products company." It, at all times, has been a small business tightly managed by the Zankowski family. As of April 2010, John Zankowski and Kevin Zankowski together owned almost a quarter of the Company's outstanding shares.

14. ImageXpres initially operated a small-scale business focused on custom graphic design; website design; color and large-format printing; and consumer photo products (such as custom-printed clocks, frames, and t-shirts). John Zankowski's subsequent attempts to expand the business through a portfolio of digital multimedia kiosks, an online advertising service, and customized medical checklist software were unsuccessful.

15. While ImageXpres did make a modest amount of sales to hospitals of "Surgical Checklist Boards," which consist of large, poster-sized checklists of patient care tasks to be completed by physicians and nursing staff, ImageXpres failed to make significant sales of these or any other products.

**The False Press Releases and Financial Statements**

16. Beginning with the year ended December 31, 2008 and continuing through the second quarter of 2011, the Defendants issued a string of unaudited financial statements and press releases for ImageXpres that conveyed a completely false impression of its operations and financial performance. While ImageXpres was reporting substantial product sales and dramatic revenue growth across all of its business lines, the Company was actually failing. The reported sales and revenues were vastly overstated and, for the most part, entirely baseless. ImageXpres

failed to secure firm customer orders that it had claimed to have and, in any event, lacked the technical ability and financial resources to manufacture the digital products that it was seeking to market on a commercial scale. Although both John Zankowski and Kevin Zankowski knew that the financial statements and accompanying press releases were grossly inaccurate and should have been corrected to disclose the fact that the claimed customer orders and reported revenues had never materialized, ImageXpres never made any corrective disclosures.

17. John Zankowski and Kevin Zankowski engaged in this conduct because, among other reasons, they sought to obtain "Current Information" status for ImageXpres on the OTC Markets website and thereby enhance investors' view of the Company. Absent such status, OTC Markets could have posted a prominent, and highly undesirable, "stop sign" warning next to the Company's name on the OTC Markets website.

18. Specifically, the Defendants had ImageXpres report grossly inflated revenue figures for 2008 and 2009 on its website and also post materially false and misleading financial statements and narrative disclosures on the OTC Markets website into 2011. During this period, ImageXpres also issued numerous press releases containing this materially false and misleading financial information. John Zankowski drafted, prepared and authorized the issuance of the documents posted on the ImageXpres and OTC Markets websites and all of the ImageXpres press releases. He also signed certifications falsely attesting to the truthfulness of the statements contained in several of ImageXpres's disclosure documents, including its annual reports. Kevin Zankowski compiled all of the false financial figures included in these documents and prepared the Company's false financial statements.

19. ImageXpres reported the following annual revenue figures for 2008, 2009, and 2010:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| SmartKiosk Systems | $100,790 | $313,890 | $889,324 |
| Printing Solutions | $145,465 | $265,220 | $1,006,298 |
| Medical Boards | $0 | $84,900 | $207,908 |
| **TOTAL** | **$246,255** | **$664,010** | **$2,103,530** |

20. ImageXpres also reported the following quarterly revenue figures for 2011:

|  | Q1 2011 | Q2 2011 |
|---|---|---|
| SmartKiosk Systems | $108,450 | $108,690 |
| Printing Solutions | $147,490 | $179,430 |
| Medical Boards | $28,304 | $34,700 |
| **TOTAL** | **$284,244** | **$322,820** |

21. As detailed below, these annual and quarterly revenue figures were materially false and lacked any basis for several reasons, and both John Zankowski and Kevin Zankowski knew that the reported revenue figures were false.

**False Statements About "SmartKiosk Systems"**

22. The foregoing revenue figures for SmartKiosk Systems were false and were reported in financial statements that were issued in tandem with press releases that repeated the false figures and contained other materially false statements about the success of this product line.

23. ImageXpres purported to offer several models of kiosks, which consisted of stand-alone electronic pedestals mounted with computer screens. ImageXpres claimed that its kiosks offered various digital and computer services, including digital photo printing; large format printing; color copying; CD burning; digital image restoration; web page design; and other similar services. ImageXpres claimed that its kiosks were designed for operation, and purportedly planned to place them, in "high traffic" retail, tourist, and entertainment locations. While the Company's public statements portrayed the SmartKiosk product line as a robust driver

7

of its revenue growth, ImageXpres failed to manufacture or sell to bona fide customers virtually any of these products during the relevant period.

24.     ImageXpres had commissioned the manufacture of no more than a dozen kiosk units in the 2003-2008 timeframe and built a few prototypes between 2008 and 2010, but it did not order or build any additional kiosk hardware because it lacked the resources necessary to manufacture kiosk units on a commercial scale and had no customer orders for these products. In an attempt to promote sales of the digital advertising products, John Zankowski and another individual formed SKH in 2008 to serve as the distributor for ImageXpres's so-called SmartKiosk Systems and other products described below. Due to John Zankowski's role in both companies, ImageXpres and SKH did not have an arms-length relationship, and SKH effectively functioned as an extension of ImageXpres.

25.     ImageXpres failed to sell any kiosk units to end-user customers from 2008 through 2011, either on its own or through SKH. Nor did ImageXpres have a full-time software developer working on SmartKiosk products, and ImageXpres failed to develop the software necessary to operate and deploy any of the planned kiosks on a commercial scale. John Zankowski and Kevin Zankowski knew that ImageXpres lacked end-user customer orders for SmartKiosk Systems or even the necessary software to deploy the product as represented. For instance, John Zankowski told a part-time ImageXpres software developer in an email in late September 2010 that the "SmartKiosk product line needs to have a working software demo" in place "very soon." A finished, commercially scalable version of SmartKiosk Systems has never been developed, and ImageXpres's reported revenue figures for SmartKiosk Systems were not supported by actual retail customer orders, manufacturing contracts or distribution agreements. In fact, the reported revenue figures were completely baseless.

26. In addition to the false revenue figures, ImageXpres also issued several press releases and narrative disclosures that contained numerous other misstatements about the purported success of the SmartKiosk product line. For example:

(a) In an October 21, 2009 press release, ImageXpres and John Zankowski falsely stated that ImageXpres is "now delivering trade production units to retail prospects in various market segments, and we have firm orders from several national retailers." As John Zankowski and Kevin Zankowski knew, no trade production units were ever delivered and no "firm orders" were ever placed by any national retailers.

(b) In a March 11, 2010 press release, ImageXpres and John Zankowski falsely stated that the SmartKiosk systems were "now being sold to retail businesses." As John Zankowski and Kevin Zankowski knew, no sales to retail businesses were occurring at that time and none ever occurred.

(c) In an April 28, 2010 press release, ImageXpres and John Zankowski again falsely stated that the SmartKiosk systems are "now being sold to retail businesses" and, in addition, that the systems "are being very well received" by the retailers. As John Zankowski and Kevin Zankowski knew, no sales to retail businesses were occurring at that time and none ever occurred.

(d) In a May 20, 2010 press release, ImageXpres and John Zankowski falsely touted the receipt of "strong orders" being "driven mainly by demand from several major retailer customers," and falsely stated that sales "are running ahead of plan." As John Zankowski and Kevin Zankowski knew, no such sales or orders occurred. In the May 20, 2010 press release, ImageXpres and John Zankowski also falsely stated that "[w]e have firm orders in-house for 250 SmartKiosk systems, to be delivered in June, all targeted for major retail customers." As John Zankowski and Kevin Zankowski knew, ImageXpres did not have the money or financing needed to build 250 units and never delivered 250 units to retail customers.

(e) In press releases dated October 21, 2010 and November 4, 2010, ImageXpres and John Zankowski falsely stated that "sales to corporate customers" were "underway." As John Zankowski and Kevin Zankowski knew, these statements were false, as ImageXpres never made sales to corporate customers.

(f) In a March 25, 2011 press release, ImageXpres and John Zankowski falsely reported "a continued strengthening of its balance sheet, income statement, and positive cash flow." As John Zankowski and Kevin Zankowski knew, these statements were false, as ImageXpres was actually experiencing serious financial problems at that time and was not generating any cash.

27. In addition to the foregoing misstatements, ImageXpres expressly represented in

its financial statements for 2009 and 2010 that those financial statements were "prepared in accordance with Generally Accepted Accounting Principles" ("GAAP"). Those statements were also false, as ImageXpres's financial statements, which were prepared by Kevin Zankowski, failed to comply with applicable revenue recognition principles. As detailed above, ImageXpres made no end-user sales of SmartKiosk Systems products, and GAAP also precluded recognition of revenue on purported transactions between ImageXpres and SKH, the affiliated distributor.

28.     In 2009, ImageXpres and SKH purportedly entered into an agreement under which SKH would place blanket purchase orders for SmartKiosk products that SKH hoped to sell to end-user customers. To the extent that ImageXpres recognized revenue in the amount of the purchase orders purportedly submitted by SKH, it was contrary to GAAP to do so. John Zankowski and Kevin Zankowski knew that SKH was not obligated to pay ImageXpres for any orders that SKH placed unless and until SKH succeeded in selling the product to an end user. John Zankowski and Kevin Zankowski also knew that SKH was unable to resell the SmartKiosk products to end-user customers, and that SKH lacked the means to pay ImageXpres absent such resales.

29.     As a result, John Zankowski and Kevin Zankowski knew that the transactions with SKH were not bona fide sales and that ImageXpres had no reasonable expectation of payment from SKH in the amounts being reported absent the existence of a firm order from an end-user for that quantity of product. John Zankowski and Kevin Zankowski further knew that SKH never paid ImageXpres for the billed amounts, yet they continued to recognize additional revenue each quarter.

30.     As promulgated by the Financial Accounting Standards Board ("FASB"), GAAP provides that revenue must be "realized or realizable" and "earned" in order to be recognized.

*See* FASB, *Revenue Recognition* (Topic 605), No. 2009-13 (Oct. 2009).  GAAP further provides that (1) "[r]evenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash revenue and gains are realized when products, merchandise, or other assets are exchanged for cash or claims to cash" and that (2) "[r]evenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash."  FASB Concepts Statement No. 5, Paragraph 83(a)-(b).  Any revenue that the Defendants claimed on transactions with SKH was not "earned" because, among other things, ImageXpres and SKH were working together to try to "resell" the product.  Nor was the revenue realizable, because any payment by SKH was contingent on resale of the product and payment by the end-user, without which SKH was unable to pay ImageXpres.  FASB Statement of Financial Accounting Standards No. 48 (Revenue Recognition When Right of Return Exists) specifically provides that revenue may be recognized from sales transactions only if the "buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product [and] the seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer."

**False Statements About "FreePrintze"**

31.   ImageXpres's "FreePrintze" advertising program was purportedly the main source of revenue for ImageXpres's Printing Solutions business line, which also included the small scale printing business.  The revenue that the Defendants attributed to FreePrintze was also baseless, as no sales of advertising had occurred at the levels reflected in the reported revenue figures.

32.   The FreePrintze program was supposed to generate advertising revenue from consumer digital photography.  The Defendants' business model assumed that customers would

upload digital photographs to www.freeprintze.com, a website run by ImageXpres, which would then send the customers free prints of their photographs on paper bearing corporate advertising. Because the prints were free, the advertising sales were the only possible source of revenue for ImageXpres from the FreePrintze program.

33. ImageXpres never successfully launched the program or generated meaningful advertising revenue from FreePrintze. ImageXpres never secured any significant advertising contracts for FreePrintze, and it generated only at most $10,000 in advertising revenue during the relevant period. John Zankowski and Kevin Zankowski knew that FreePrintze was failing to generate any significant advertising revenue.

34. Moreover, ImageXpres struggled even to just build and launch the FreePrintze website, and in July 2010 hired a part-time software developer to help build the website. The FreePrintze website was not fully operational at that time, and customers were not able to upload images to it. The part-time software developer quit and the FreePrintze website never became fully operational, because ImageXpres lacked the funds to make the necessary upgrades to it.

35. Despite the foregoing, the Defendants publicly reported substantial revenue for the Printing Solutions business line from 2009 through the second quarter of 2011, the majority of which was purportedly attributable to FreePrintze. For example, ImageXpres's 2010 financial statements showed revenue for the Printing Solutions business growing from $265,220 in 2009 to $1,006,298 in 2010, an increase of 379 percent. These revenue figures were false, and John Zankowski and Kevin Zankowski knew that ImageXpres lacked the advertising revenue from FreePrintze to support the reported amounts.

36. The Company's press releases reiterated many of the false revenue figures and contained other false statements about FreePrintze. For example:

(a) In a May 20, 2010 press release, John Zankowski and ImageXpres falsely stated that "[s]ales of . . . our FreePrintze multimedia advertising platform . . . are running ahead of plan." As John Zankowski and Kevin Zankowski knew, no such sales of FreePrintze were occurring at this time.

(b) In an October 21, 2010 press release, John Zankowski and ImageXpres falsely referenced "the strong performance gains in acceptance of the Company's newly launched FreePrintze™ direct mail photo-ad service by local and national advertisers." As John Zankowski and Kevin Zankowski knew, no national advertisers had any involvement with FreePrintze at this or any other time.

(c) In a March 25, 2011 press release, John Zankowski and ImageXpres falsely referenced a "spike" in FreePrintze advertising revenues. As John Zankowski and Kevin Zankowski knew, no such "spike" occurred.

37. To the extent that the Printing Solutions revenue figures were based on purported billings from ImageXpres to SKH, the reported amounts were nevertheless baseless. Although ImageXpres sent SKH pre-printed FreePrintze advertising packets, SKH distributed the packets as free promotional literature and never intended to pay, or paid, ImageXpres for the packets.

**False Statements About "Surg-i-Scan" Software**

38. From 2009 to 2011, ImageXpres's press releases also contained misstatements about its medical software, named "Surg-i-Scan." Surg-i-Scan is an iPhone application that contains checklists of patient care tasks for hospital medical personnel, similar to ImageXpres's medical checklist poster board. While ImageXpres launched a free version of the Surg-i-Scan iPhone application in July 2010, ImageXpres's press releases and its other public disclosure documents misrepresented the application's development status and commercial benefits for ImageXpres.

39. The application was free for download, which meant that ImageXpres made no money from downloads. Nor did ImageXpres receive any data on the number of downloads or the identities of the downloaders. Also, there were no "customized" versions of the application for sale to individual customers.

40. John Zankowski and ImageXpres made the following false statements, among others, in press releases about Surg-i-Scan:

(a) In an August 20, 2009 press release, John Zankowski and ImageXpres falsely stated that Surg-i-Scan "will be fully tested in hospital market trials before being generally available by fourth quarter." As John Zankowski and Kevin Zankowski knew, no market trials were occurring at that time. ImageXpres did not sign a contract for the software development until May 2010 and Apple did not approve the application for download until July 2010, nearly one year later, and the unavailability of download data meant that ImageXpres could not determine whether or which hospitals were actually downloading the application.

(b) In a February 4, 2010 press release, John Zankowski and ImageXpres falsely stated that Surg-i-Scan and "accompanying checklist flatscreen displays, has been undergoing rigorous testing, and the software is now ready for large-scale sales to hospitals, clinics, and physicians['] offices." As John Zankowski and Kevin Zankowski knew, the software was not available for download until July 2010, and the downloads were free.

(c) In August 25, 2010 press release, John Zankowski and ImageXpres falsely stated that ImageXpres was "receiving sales inquiries from hospitals now trialing the Surg-i-Scan digital safety checklist application." As John Zankowski and Kevin Zankowski knew, ImageXpres was not selling the application and there was no way of knowing whether or which hospitals were downloading the application.

## **CLAIM FOR RELIEF**

**Violations of Section 10(b) of
the Exchange Act and Rule 10b-5**

41. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 40.

42. The Defendants, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in the light of

the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

43. By reason of the foregoing, the Defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining ImageXpres, John Zankowski, and Kevin Zankowski from committing the violations of the federal securities laws alleged in this complaint;

### II.

Prohibiting John Zankowski and Kevin Zankowski, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act,15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d);

### III.

Prohibiting John Zankowski and Kevin Zankowski, pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), from participating in an offering of penny stock;

### IV.

Ordering John Zankowski and Kevin Zankowski to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**V.**

Granting such other and further relief as the Court may deem just and proper.

Dated: September 25, 2013
       New York, New York

    /s/ Sanjay Wadhwa
Sanjay Wadhwa
Senior Associate Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York  10281
(212) 336-0181

Of Counsel:

Andrew M. Calamari
George N. Stepaniuk
Charu Chandrasekhar